IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PATSY ORMSBY and <br> JEREMY GILMORE, <br><br> Plaintiff, <br><br> v. <br><br> IMHOFF & ASSOCIATES, PC, <br> PAL. A. LENGYEL-LEAHU, <br> and CHRISTOPHER R. <br> WILLIAMS <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Case No. _____ |

## COMPLAINT

Plaintiffs Patsy Ormsby and Jeremy Gilmore, by and through counsel Branden A. Bell of Brown & Ruprecht, PC, and for their causes of action against Imhoff & Associates, PC, Pal A. Lengyel-Leahu and Christopher R. Williams, state and allege the following:

## INTRODUCTION

1.    Patsy Ormsby ("Ormsby") and Jeremy Gilmore ("Gilmore") bring this diversity action for legal malpractice, breach of contract, negligent misrepresentation, fraud, and violations of the Kansas Consumer Protection Act against defendants: Imhoff & Associates, PC ("Imhoff"); Pal A. Lengyel-Leahu ("Lengyel-Leahu")_; and Christopher R. Williams ("Williams").

2.    Ormsby and Gilmore bring this action against defendants under the Court's diversity jurisdiction in 28 U.S.C. § 1332(a)(1). Ormsby is an individual domiciled in Missouri. Gilmore is currently incarcerated in Kentucky with a

domicile in Missouri. Imhoff is a professional corporation organized under the laws of the State of California. On information and belief, Lengyel-Leahu is an individual domiciled in California. On information and belief, Williams is an individual domiciled in Kansas. The amount in controversy exceeds $75,000.00.

3.   Ormsby and Gilmore request compensatory damages, punitive damages, statutory damages, and any other relief available.

4.   This case arises from the breach of contract and legal malpractice of Imhoff and its employees. Ormsby paid Imhoff $54,250.00 to represent Gilmore in post-trial and appellate matters. Specifically, Imhoff promised to: a) file a motion for new trial; b) advocate for Mr. Gilmore during the sentencing phase of his trial; and c) pursue the appeal of Mr. Gilmore's conviction. Imhoff failed to complete any of the listed tasks with the ordinary care and diligence owed to a client from legal professionals.

## JURISDICTION AND VENUE

5.   This Court has jurisdiction under 18 U.S.C. § 1332(a)(1).

6.   Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the substantial acts of malpractice and breach of contract occurred in Kansas during Imhoff's representation of Gilmore.

7.   Venue is also proper under 29 U.S.C. § 1391(b)(3) because all of the defendants submitted to personal jurisdiction by either appearing pro hac vice in Mr. Gilmore's case or holding a Kansas license to practice law.

## PARTIES & AGENCY

8.   Plaintiff Patsy Ormsby is an individual citizen of Missouri.

9.   Plaintiff Jeremy Gilmore is an individual currently incarcerated in
      Kentucky and a citizen of Missouri.

10.  Defendant Imhoff & Associates, PC is a corporation organized under the laws
      of the State of California with its principal place of business and place of
      incorporation in California, with a registered agent of Shawnna King at 12424
      Wilshire Blvd., Suite 770, Los Angeles, California 90025.

11.  Defendant Pal A. Lengyel-Leahu is an individual citizen of California and
      may be served at: 360 E. 1st Street, Suite 609, Tustin, California 92780.

12.  Defendant Christopher R. Williams is an individual citizen of Kansas and
      may be served at: 753 State Avenue, Suite 658, Kansas City, Kansas 66101.

13.  All of the acts of Lengyel-Leahu, and Williams alleged in this complaint
      occurred while Lengyel-Leahu and Williams acted within the course and
      scope of their employment with Imhoff.

14.  Defendant Imhoff is vicariously liable for the tortious, fraudulent, or
      otherwise illegal actions of its employees alleged in this complaint.

## FACTUAL ALLEGATIONS

**A.   Hiring of Imhoff**

15.  Plaintiff incorporates by reference all preceding paragraphs.

16. On May 26, 2009, Gilmore was convicted of conspiring to distribute and possess with intent to distribute more than 50 grams of methamphetamine in the United States District Court for the District of Kansas.

17. As a result of his conviction, Gilmore faced a mandatory sentence of life imprisonment.

18. Gilmore's family, desperate to save him from this fate, scoured the Internet for attorneys to handle his post-conviction motions, sentencing, and appeal. They found Imhoff & Associates, which advertised:

   a.   the firm had won the reversal of many cases;

   b.   the firm had "qualified and aggressive" attorneys who "dont (sic) give up easily!";

   c.   "the most competent, experienced and effective attorney[s] available"; and,

   d.   "aggressive and resourceful attorney[s]" who were "intimately familiar with all facets of criminal defense."

19. After reading the website, Lois Gilmore, Mr. Gilmore's mother, called Imhoff to take advantage of its "free consultation."

20. During the phone call, an unknown employee at Imhoff told Lois:

   a.   Imhoff was actually the former Johnny Cochran Law Firm;

   b.   "You probably remember the catchy phrase"; and,

   c.   If Gilmore's family wanted to hire Imhoff, they needed to act quickly and wire Imhoff the funds;

21. Lois relayed this information to Mr. Gilmore's grandmother, Patsy Ormsby. Two days later, Ormsby retained Imhoff to represent Gilmore by executing a pre-printed Retainer Agreement drafted by Imhoff.

22. Under the retainer agreement, Imhoff agreed to a) file a motion for new trial, b) advocate for Gilmore during the sentencing phase of his trial, and c) pursue the appeal of Gilmore's conviction.

23. For these services, Ormsby paid Imhoff $49,250.00 via a wire transfer on May 29, 2009.

24. Ormsby also opened a trust account with Imhoff, into which she paid an additional $5,000.00.

25. In total, Ormsby paid Imhoff $54,250.00.

26. Imhoff assigned two attorneys to represent Gilmore: Lengyel-Leahu and Williams.

27. Shortly after receiving Ormsby's money, Imhoff dispatched Lengyel-Leahu from California to meet with Gilmore's family. He told them that:

    a.    The Government could not legally charge Gilmore with the crime he was convicted of, and Lengyel-Leahu would "show the judge";

    b.    Lengyel-Leahu would have Gilmore home "in a year";

    c.    Ormsby was "lucky" that Lengyel-Leahu represented Gilmore;

    d.    Ormsby could not trust the "po-dunk" attorneys in Kansas to defend Gilmore;

e.  Gilmore's defense required someone with more knowledge than the "po-dunk" lawyers in Kansas;

f.  Lengyel-Leahu would show the judge that Gilmore's conviction did not require a life sentence;

g.  Lengyel-Leahu had convinced many judges in California to throw out similar cases;

h.  Lengyel-Leahu predicted that it would take a year, but Gilmore's sentence would be reduced or completely thrown out;

i.  Lengyel-Leahu opined that the conviction could be overturned because the district court had not instructed the jury on measurements, quantities, or amounts; and

j.  Imhoff only used "the best attorneys."

### 2.  Post-trial Motions

28.  Neither Lengyel-Leahu nor Williams reviewed the transcripts of the guilt phase of Gilmore's trial.

29.  Though the retainer agreement specifically included filing a motion for new trial as one of Imhoff's duties, neither Lengyel-Leahu nor Williams filed one.

30.  A motion for new trial would have been successful based on the ineffectiveness of Gilmore's initial and trial counsel, as evidenced by the court's finding of a Sixth Amendment violation on post-conviction review.

31.  The presentence investigation report contained an erroneous claim that Gilmore possessed a firearm during the commission of the crime.

32. Neither Lengyel-Leahu nor Williams objected to the presentence investigation report.

33. Neither Lengyel-Leahu nor Williams filed a sentencing memorandum on Gilmore's behalf.

34. Lengyel-Leahu appeared on Gilmore's behalf at the sentencing hearing. He argued that the court should deviate from the sentence mandated by Congress, but, as the Hon. John W. Lungstrum remarked, provided "absolutely no authority other than incantations to the Constitution."

35. Lengyel-Leahu's performance at Gilmore's sentencing hearing drew criticism from the court. The court commented that:

   a. Lengyel-Leahu had given the Gilmore family "false hope";

   b. Lengyel-Leahu's failure to read the trial transcript was "outrageous"; and

   c. If Lengyel-Leahu had "law to show [the Court] that would indicate that there was some other alternative [to the statutory minimum], [the Court] would certainly give it due consideration, but walking in at a sentencing hearing and making high blown rhetoric is not the same as making legal argument."

36. Gilmore was sentenced to life imprisonment at a high-security prison.

### 3.   The Appeal

37. On October 29, 2009, a Notice of Appeal was filed in Gilmore's case.

38. Williams failed to timely file his entry of appearance or a transcript order.

39. Gilmore's docketing statement was due on November 17, 2009.

40. Williams filed a docketing statement with the Court of Appeals on November 16, 2009, which the court rejected as deficient.

41. Eight days later, Williams filed a motion for extension of time to file the docketing statement, which the court rejected as procedurally defective.

42. Though the court denied Williams's motion for extension, it nonetheless extended the time for Williams to correctly file the necessary documents, cautioning that:

   a. Williams had "gotten off to a difficult start with the court";

   b. The court takes its rules and deadlines seriously; and

   c. Williams should read the court's rules and to comply with "all court orders and deadlines because continued non-compliance can lead to disciplinary action."

43. Williams filed another docketing statement, which the court again rejected as deficient.

44. The court also rejected Williams's designation of record.

45. On December 7, 2009 — twenty days after its original due date — Williams filed a proper docketing statement.

46. Williams's brief was due on March 30, 2010.

47. On March 23, 2010, Williams filed his first motion for extension of time to file the brief.

48. The court granted Williams's motion, set a new due date of May 28, 2010, and warned it would grant no further extensions.

49. On May 26, 2010, Williams filed another motion for extension.

50. The court granted this motion, and reset the due date for June 9, 2010.

51. On June 9, 2010, Williams filed yet another motion for extension.

52. The court denied the motion, cautioning Williams that the appeal would be dismissed if the brief was not filed by June 11, 2010.

53. Williams attempted to file Gilmore's brief on June 11, 2010, but the court rejected it as deficient.

54. Williams filed a corrected brief nearly two weeks later.

55. Once properly submitted, Williams's brief raised the same erroneous arguments made by trial counsel. These very same arguments would, on the court's consideration of Gilmore's § 2255 motion, be evidence of trial counsel's constitutionally deficient performance.

56. The Tenth Circuit easily dismissed these claims:

   a.   It held that the jury "could not rationally" have rendered the verdict Williams argued for;

   b.   The jury affirmatively found Gilmore guilty as a principal, rendering the aiding-and-abetting argument meaningless; and,

   c.   There was overwhelming evidence of Mr. Gilmore's guilt.

   **4.   Postconviction Motion**

57. Gilmore filed a pro se motion to vacate his sentence under 28 U.S.C. § 2255.

58.   The court took under advisement and set for evidentiary hearing Gilmore's claim that the performance of his initial and trial counsel were deficient because "his counsel failed to advise him sufficiently concerning whether to plead guilty instead of proceeding to trial" by:

   a.   failing to "meaningfully communicate to [Gilmore] the government's plea offers;

   b.   failing to "advise [Gilmore] that a conviction at trial would guarantee him a life sentence in light of his two prior felony drug convictions;

   c.   failing to negotiate and secure "a plea agreement prior to the government's filing of an information under 21 U.S.C. § 851"; and

   d.   lacking "sufficient knowledge of the federal drug conspiracy laws such that she misinformed Mr. Gilmore about his likelihood of success at trial."

59.   The court appointed new counsel to represent Gilmore at his evidentiary hearing.

60.   On January 28, 2013, the court held an evidentiary hearing on Gilmore's claim, which included testimony from Gilmore's initial counsel, Gilmore's trial counsel, the prosecution Assistant United States Attorney, and Gilmore.

61.   On February 4, 2013, the court issued its order, finding that Gilmore "received constitutionally deficient representation in each of the [claimed] respects and that such representation undoubtedly prejudiced the outcome of the case."

62. As a remedy for the Sixth Amendment violation, Gilmore entered into a Sentencing Agreement with the government on May 30, 2013.

63. That same day, the Court amended Gilmore's judgment. His life sentence was removed, and Gilmore was sentenced to 168 months imprisonment.

## COUNT I
## LEGAL MALPRACTICE - IMHOFF, LENGYEL-LEAHU, WILLIAMS
### (The Motion for New Trial)

64. Plaintiff incorporates by reference all preceding paragraphs.

65. Lengyel-Leahu had a duty to represent Gilmore with the ordinary skill and knowledge of an attorney in the preparation, filing, and arguing of Gilmore's motion for new trial.

66. Williams had a duty to represent Gilmore with the ordinary skill and knowledge of an attorney in the preparation, filing, and arguing of Gilmore's motion for new trial.

67. Imhoff had a duty to represent Gilmore with the ordinary skill and knowledge of an attorney in the preparation, filing, and arguing of Gilmore's motion for new trial.

68. Lengyel-Leahu, Williams, and Imhoff breached that duty by failing to review the trial transcripts, or perform any work at all toward filing a motion for new trial.

69. Lengyel-Leahu, Williams, and Imhoff's failure fell below the standard of ordinary care and diligence a reasonably competent lawyer would use in representing a client on a motion for new trial.

70. As a result of Lengyel-Leahu, Williams, and Imhoff's failure, the ineffective assistance that Gilmore's trial counsel rendered went undiscovered.

71. After reviewing the trial transcripts, a reasonable attorney — exercising ordinary skill and knowledge — would have discovered that Gilmore's trial counsel had rendered ineffective assistance and won him a new trial.

72. Because of Lengyel-Leahu, Williams, and Imhoff's failure, Ormsby and Gilmore suffered emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

73. Because of Lengyel-Leahu, Williams, and Imhoff's failure, Gilmore suffered additional restrictions on his freedom from being assigned to a higher-security prison than he should have been.

## COUNT II
## LEGAL MALPRACTICE - IMHOFF, LENGYEL-LEAHU, WILLIAMS
### (Sentencing)

74. Plaintiff incorporates by reference all preceding paragraphs.

75. Lengyel-Leahu had a duty to represent Gilmore with the ordinary skill and knowledge of an attorney in the preparation and litigation of Gilmore's sentencing.

76. Williams had a duty to represent Gilmore with the ordinary skill and knowledge of an attorney in the preparation and litigation of Gilmore's sentencing.

77.   Imhoff had a duty to supply Gilmore with the ordinary skill and knowledge of an attorney in the preparation and litigation of Gilmore's sentencing.

78.   Lengyel-Leahu, Williams, and Imhoff breached that duty by failing to review the trial transcripts, object to the pre-sentence report, file a sentencing memorandum, or otherwise participate in the sentencing in any meaningful way.

79.   Lengyel-Leahu, Williams, and Imhoff's failure fell below the standard of ordinary care and diligence a reasonably competent lawyer would use in representing a client during sentencing.

80.   As a result of Lengyel-Leahu, Williams, and Imhoff's failure, an error in Gilmore's pre-sentence report went undiscovered.

81.   After reviewing the trial transcripts, a reasonable attorney — exercising ordinary skill and knowledge — would have discovered that error and corrected it during sentencing.

82.   Because of Lengyel-Leahu, Williams, and Imhoff's failure, the erroneous material stayed in his pre-sentence report.

83.   Due to his erroneous pre sentence report, Mr. Gilmore was placed in a higher-security facility, with greater restrictions on his freedom, than he otherwise would have been.

## COUNT III
## LEGAL MALPRACTICE - IMHOFF & WILLIAMS
### (The Appeal)

84.   Plaintiff incorporates by reference all preceding paragraphs.

85.  Williams had a duty to represent Gilmore with the ordinary skill and knowledge of an attorney in the preparation and litigation of Gilmore's sentencing.

86.  Imhoff had a duty to supply Gilmore with the ordinary skill and knowledge of an attorney in the preparation and litigation of Gilmore's appeal.

87.  Williams and Imhoff breached that duty by repeating trial counsel's argument that "sharing" drugs is not the same as "distributing" drugs on appeal.

88.  Williams and Imhoff further breached that duty by failing to file appeal documents in an expeditious manner, incurring extra expense.

89.  Williams and Imhoff's conduct fell below the standard of ordinary care and diligence a reasonably competent lawyer would use in representing a client on appeal.

90.  As a result of Williams and Imhoff's failure, Gilmore's appeal dragged on unnecessarily.

91.  During that time, Ormsby and Gilmore suffered emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

## COUNT IV
## BREACH OF CONTRACT
### (Imhoff)

92.  Plaintiff incorporates by reference all preceding paragraphs.

93.  The retainer agreement executed by Ormsby and Imhoff was a contract for legal services.

14

94. The retainer agreement engaged Imhoff to complete the following duties: 1) file and argue a motion for new trial; 2) represent Gilmore in his sentencing proceedings; and 3) appeal his conviction to the Tenth Circuit Court of Appeals.

95. This contract contained an implied warranty that the services would be performed in a workmanlike manner.

96. In return for the promise of the above-listed legal services, Ormsby paid Imhoff a $49,250 retainer via a wire transfer on May 29, 2009, and an additional $5,000 to a trust account.

97. Imhoff did not complete any of the above-listed duties with the ordinary care and diligence owed to a lawyer's client.

98. Neither Imhoff nor its agents filed a motion for new trial or took any real steps to do so.

99. Neither Imhoff nor its agents objected to Gilmore's pre-sentence report.

100. Neither Imhoff nor its agents filed a sentencing memorandum on Gilmore's behalf.

101. Neither Imhoff nor its agents raised any legal arguments during Gilmore's sentencing hearing.

102. Neither Imhoff nor its agents timely filed appropriate documents on appeal.

103. Neither Imhoff nor its agents raised any meritorious claims on appeal.

104. In so failing to fulfill its duties, Imhoff breached its implied warranty of workmanlike performance.

105.  In so failing to fulfill its duties, Imhoff failed to do that which it expressly agreed to perform.

106.  Ormsby lost $54,250.00 as the proximate cause of Imhoff's breach of contract.

## COUNT V
## NEGLIGENT MISREPRESENTATION
### (Imhoff)

107.  Plaintiff incorporates by reference all preceding paragraphs.

108.  Imhoff's website advertised that it had:

a.  "qualified and aggressive" attorneys who "dont (sic) give up easily!";

b.  "the most competent, experienced and effective attorney[s] available"; and,

c.  "aggressive and resourceful attorney[s]" who were "intimately familiar with all facets of criminal defense."

109.  Imhoff supplied this information, in the course of its business, to guide Ormsby in choosing it to represent Gilmore.

110.  The information was false.

111.  Ormsby reasonably relied on these representations in entering into the retainer agreement with Imhoff.

112.  Imhoff failed to exercise reasonable care or competence in making these communications to Ormsby.

113.  Ormsby was among the group of people that Imhoff knew the communication would reach.

114.  Ormsby's damages were suffered in the transaction that Imhoff intended to influence.

115.  As a result, Ormsby lost $54,250.

116.  In addition, Ormsby's and Gilmore's reliance on Imhoff's false representations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

117.  Gilmore's reliance on Imhoff's false representations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

## COUNT VI
## NEGLIGENT MISREPRESENTATION
### (Lengyel-Leahu)

118.  Plaintiff incorporates by reference all preceding paragraphs.

119.  In the course of his employment with Imhoff, Lengyel-Leahu supplied the following information to Ormsby:

    a.  The Government could not legally charge Gilmore with the crime he was convicted of, and Lengyel-Leahu would "show the judge";

    b.  Lengyel-Leahu would have Gilmore home "in a year";

    c.  Ormsby was "lucky" that Lengyel-Leahu represented Gilmore;

    d.  Ormsby could not trust the "po-dunk" attorneys in Kansas to defend Gilmore;

    e.  Gilmore's defense required someone with more knowledge than the "po-dunk" lawyers in Kansas;

f.  Lengyel-Leahu would show the judge that Gilmore's conviction did not require a life sentence;

g.  Lengyel-Leahu had convinced many judges in California to throw out similar cases;

h.  Lengyel-Leahu predicted that it would take a year, but Gilmore's sentence would be reduced or completely thrown out;

i.  Lengyel-Leahu opined that the conviction could be overturned because the district court had not instructed the jury on measurements, quantities, or amounts; and

j.  Imhoff only used "the best attorneys."

120.  Lengyel-Leahu supplied this information to guide Ormsby to continue to pay Imhoff to represent Gilmore.

121.  The information was false.

122.  Ormsby reasonably relied on these representations in continuing to pay Imhoff.

123.  Lengyel-Leahu failed to exercise reasonable care or competence in making these communications to Ormsby.

124.  Ormsby was among the group of people that Lengyel-Leahu knew the communication would reach.

125.  Ormsby's damages were suffered in the transaction that Lengyel-Leahu intended to influence.

126.  As a result, Ormsby lost $54,250.

127. In addition, Ormsby's and Gilmore's reliance on Imhoff's false representations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

128. Gilmore's reliance on Imhoff's false representations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

## COUNT VII
## FRAUD
## (Imhoff)

129. Plaintiff incorporates by reference all preceding paragraphs.

130. Imhoff promised Ormsby and Gilmore that it would file a motion for new trial for Gilmore.

131. Imhoff had no intention of performing its promise at the time it made it.

132. Imhoff did not perform its promise as it represented that it would.

133. Imhoff made the promise with the intent to deceive and for the purpose of inducing Ormsby and Gilmore to act on the promise.

134. Ormsby reasonably relied and acted upon the promise.

135. Ormsby and Gilmore suffered monetary damages of $54,250.00 as a result of their reliance on Imhoff's promise. In addition, Ormsby's and Gilmore's reliance on Imhoff's false representations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

136.   Gilmore's reliance on Imhoff's false representations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

## COUNT VIII
## FRAUD
### (Lengyel-Leahu)

137.   Plaintiff incorporates by reference all preceding paragraphs.

138.   Lengyel-Leahu promised to:

a.   "show the judge" that Gilmore could not have been convicted of his crime of conviction;

b.   have Gilmore home "in a year";

c.   bring more knowledge to Gilmore's case than the "po-dunk" lawyers in Kansas;

d.   show the judge that Gilmore's conviction did not require a life sentence;

e.   convince the court to reduce or completely throw out Gilmore's sentence;

f.   use only "the best attorneys."

139.   Lengyel-Leahu had no intention of performing any of these promises at the time he made them.

140.   Lengyel-Leahu did not perform any of these promises as he represented he would.

141.  Lengyel-Leahu made these promises with the intent to deceive and for the purpose of inducing Ormsby and Gilmore to act on his promises.

142.  Ormsby and Gilmore reasonably relied and acted upon the promise.

143.  Ormsby suffered monetary damages of $54,250.00 as a result of their reliance on Imhoff's promise.

144.  In addition, Ormsby's and Gilmore's suffered emotional damage from the increased anxiety and emotional trauma of believing Gilmore would die in prison.

145.  Gilmore's reliance on Imhoff's false representations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

## COUNT IX
## FRAUD
### (Imhoff)

146.  Plaintiff incorporates by reference all preceding paragraphs.

147.  Imhoff's statement that the firm would file a motion for new trial on Gilmore's behalf was false because Imhoff did not intend to file or argue the motion.

148.  Imhoff's statement was material because if it never told Ormsby it would file the motion for new trial, Ormsby never would have entered into the retainer agreement with Imhoff or wired it the $49,250.00 retainer fee.

149.  Imhoff knew it would not file a motion for new trial.

150.  Imhoff knew the statements made to Ormsby would urge her decision to hire the firm.

151.  Ormsby did not know Imhoff would not file the motion for new trial.

152.  Ormsby had a right to rely on the truth of Imhoff's representations because Imhoff affirmatively told her that its duties included filing a motion for new trial.

153.  Ormsby lost $54,250.00 as the proximate cause of Imhoff's fraudulent statement.

154.  Ormsby's and Gilmore's reliance on Imhoff's fraudulent statement caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

155.  Gilmore's reliance on Imhoff's fraudulent statement caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

## COUNT X
## FRAUD
### (Lengyel-Leahu)

156.  Plaintiff incorporates by reference all preceding paragraphs.

157.  Imhoff's represented on its website that:

    a.  had "qualified and aggressive" attorneys who "dont (sic) give up easily!";

    b.  "the most competent, experienced and effective attorney[s] available"; and

    c.  "aggressive and resourceful attorney[s]" who were "intimately familiar with all facets of criminal defense."

158. These representations were false.

159. These representations were made as statements of existing and material fact.

160. Imhoff knew these statements were false when it made them.

161. Imhoff recklessly made these statements without knowledge concerning them.

162. Imhoff intentionally made these representations for the purpose of inducing Ormsby and Gilmore to act on them.

163. Ormsby and Gilmore reasonably relied and acted upon Imhoff's representations.

164. Ormsby lost $54,250.00 as the proximate cause of Imhoff's fraudulent statement.

165. Ormsby's and Gilmore's reliance on Imhoff's fraudulent statement caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

166. Gilmore's reliance on Imhoff's fraudulent statement caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

**COUNT XI**
**FRAUD**
**(Lengyel-Leahu)**

167. Plaintiff incorporates by reference all preceding paragraphs.

168. In the scope of his employment with Imhoff, Lengyel-Leahu represented to Ormsby that:

a.   The Government could not legally charge Gilmore with the crime he was convicted of, and Lengyel-Leahu would "show the judge";

b.   Lengyel-Leahu would have Gilmore home "in a year";

c.   Ormsby was "lucky" that Lengyel-Leahu represented Gilmore;

d.   Ormsby could not trust the "po-dunk" attorneys in Kansas to defend Gilmore;

e.   Gilmore's defense required someone with more knowledge than the "po-dunk" lawyers in Kansas;

f.   Lengyel-Leahu would show the judge that Gilmore's conviction did not require a life sentence;

g.   Lengyel-Leahu had convinced many judges in California to throw out similar cases;

h.   Lengyel-Leahu predicted that it would take a year, but Gilmore's sentence would be reduced or completely thrown out;

i.   Lengyel-Leahu opined that the conviction could be overturned because the district court had not instructed the jury on measurements, quantities, or amounts; and

j.   Imhoff only used "the best attorneys." Lengyel-Leahu had no intention of performing any of these promises at the time he made them.

169.  These representations were false.

170. These representations were made as statements of existing and material fact.

171. Lengyel-Leahu knew these statements were false when he made them.

172. Lengyel-Leahu recklessly made these statements without knowledge concerning them.

173. Lengyel-Leahu intentionally made these representations for the purpose of inducing Ormsby and Gilmore to act on them.

174. Ormsby and Gilmore reasonably relied and acted upon Lengyel-Leahu's representations.

175. Ormsby lost $54,250.00 as the proximate cause of Lengyel-Leahu's fraudulent statement.

176. Ormsby's and Gilmore's reliance on Lengyel-Leahu's fraudulent statement caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

177. Gilmore's reliance on Imhoff's fraudulent statement caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

### COUNT XII
### VIOLATION OF KANSAS
### CONSUMER PROTECTION ACT
### (Imhoff)

178. Plaintiff incorporates by reference all preceding paragraphs.

179. Ormsby and Gilmore were consumers.

180. Imhoff was a supplier of legal services.

181. Imhoff represented directly to Ormsby, and indirectly to Gilmore, that Imhoff had "qualified" attorneys.

182. Imhoff did not have qualified attorneys.

183. Imhoff made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that it did not have qualified attorneys.

184. As the proximate cause of Imhoff's deceptive misrepresentations, Ormsby lost $54,250.00 by paying Imhoff to supply unqualified attorneys.

185. Ormsby's and Gilmore's reliance on Imhoff's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

186. Gilmore's reliance on Imhoff's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

**COUNT XIII**
**VIOLATION OF KANSAS**
**CONSUMER PROTECTION ACT**
**(Imhoff)**

187. Plaintiff incorporates by reference all preceding paragraphs.

188. Ormsby and Gilmore were consumers.

189. Imhoff was a supplier of legal services.

190. Imhoff represented directly to Ormsby, and indirectly to Gilmore, that Imhoff had "aggressive" attorneys.

191. Imhoff did not have "aggressive" attorneys.

192. Imhoff made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that it did not have "aggressive" attorneys.

193. As the proximate cause of Imhoff's deceptive misrepresentations, Ormsby lost $54,250.00 by paying Imhoff to supply non-aggressive attorneys.

194. Ormsby's and Gilmore's reliance on Imhoff's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

195. Gilmore's reliance on Imhoff's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

**COUNT XIV
VIOLATION OF KANSAS
CONSUMER PROTECTION ACT
(Imhoff)**

196. Plaintiff incorporates by reference all preceding paragraphs.

197. Ormsby and Gilmore were consumers.

198. Imhoff was a supplier of legal services.

199. Imhoff represented directly to Ormsby, and indirectly to Gilmore, that Imhoff had attorneys that "did not give up easily."

200. Imhoff did not have attorneys "that did not give up easily."

201. Imhoff made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that it did not have attorneys "that did not give up easily."

202. As the proximate cause of Imhoff's deceptive misrepresentations, Ormsby lost $54,250.00 by paying Imhoff to supply attorneys that gave up easily.

203. Ormsby's and Gilmore's reliance on Imhoff's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

204. Gilmore's reliance on Imhoff's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

**COUNT XV**
**VIOLATION OF KANSAS**
**CONSUMER PROTECTION ACT**
**(Imhoff)**

205. Plaintiff incorporates by reference all preceding paragraphs.

206. Ormsby and Gilmore were consumers.

207. Imhoff was a supplier of legal services.

208. Imhoff represented directly to Ormsby, and indirectly to Gilmore, that Imhoff had the "most competent" attorneys "available."

209. Imhoff did not have the "most competent" attorneys "available."

210. Imhoff made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that it did not have the "most competent" attorneys "available."

211. As the proximate cause of Imhoff's deceptive misrepresentations, Ormsby lost $54,250.00 by paying Imhoff to supply incompetent attorneys.

212. Ormsby's and Gilmore's reliance on Imhoff's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

213. Gilmore's reliance on Imhoff's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

## COUNT XVI
## VIOLATION OF KANSAS
## CONSUMER PROTECTION ACT
### (Imhoff)

214. Plaintiff incorporates by reference all preceding paragraphs.

215. Ormsby and Gilmore were consumers.

216. Imhoff was a supplier of legal services.

217. Imhoff represented directly to Ormsby, and indirectly to Gilmore, that Imhoff had the "most…experienced" attorneys "available."

218. Imhoff did not have "most…experienced" attorneys "available."

219.   Imhoff made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that it did not have the "most...experienced" attorneys "available."

220.   As the proximate cause of Imhoff's deceptive misrepresentations, Ormsby lost $54,250.00 by paying Imhoff to supply inexperienced attorneys.

221.   Ormsby's and Gilmore's reliance on Imhoff's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

222.   Gilmore's reliance on Imhoff's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

### COUNT XVII
### VIOLATION OF KANSAS
### CONSUMER PROTECTION ACT
### (Imhoff)

223.   Plaintiff incorporates by reference all preceding paragraphs.

224.   Ormsby and Gilmore were consumers.

225.   Imhoff was a supplier of legal services.

226.   Imhoff represented directly to Ormsby, and indirectly to Gilmore, that Imhoff had the "most...effective" attorneys "available."

227.   Imhoff did not have the "most...effective" attorneys "available."

228. Imhoff made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that it did not have the "most…effective" attorneys "available."

229. As the proximate cause of Imhoff's deceptive misrepresentations, Ormsby lost $54,250.00 by paying Imhoff to supply ineffective attorneys.

230. Ormsby's and Gilmore's reliance on Imhoff's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

231. Gilmore's reliance on Imhoff's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

## COUNT XVIII
## VIOLATION OF KANSAS
## CONSUMER PROTECTION ACT
### (Imhoff)

232. Plaintiff incorporates by reference all preceding paragraphs.

233. Ormsby and Gilmore were consumers.

234. Imhoff was a supplier of legal services.

235. Imhoff represented directly to Ormsby, and indirectly to Gilmore, that Imhoff had "resourceful" attorneys.

236. Imhoff did not have "resourceful" attorneys.

237. Imhoff made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that it did not have "resourceful" attorneys.

238. As the proximate cause of Imhoff's deceptive misrepresentations, Ormsby lost $54,250.00 by paying Imhoff to supply unresourceful attorneys.

239. Ormsby's and Gilmore's reliance on Imhoff's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

240. Gilmore's reliance on Imhoff's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

## COUNT XIX
## VIOLATION OF KANSAS
## CONSUMER PROTECTION ACT
## (Imhoff)

241. Plaintiff incorporates by reference all preceding paragraphs.

242. Ormsby and Gilmore were consumers.

243. Imhoff was a supplier of legal services.

244. Imhoff represented directly to Ormsby, and indirectly to Gilmore, that Imhoff had attorneys who were "intimately familiar with all facets of criminal defense."

245. Imhoff did not have attorneys who were "intimately familiar with all facets of criminal defense."

32

246. Imhoff made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that it did not have attorneys who were "intimately familiar with all facets of criminal defense."

247. As the proximate cause of Imhoff's deceptive misrepresentations, Ormsby lost $54,250.00 by paying Imhoff to supply attorneys who were not intimately familiar with all facets of criminal defense.

248. Ormsby's and Gilmore's reliance on Imhoff's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

249. Gilmore's reliance on Imhoff's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

## COUNT XX
## VIOLATION OF KANSAS
## CONSUMER PROTECTION ACT
### (Imhoff)

250. Plaintiff incorporates by reference all preceding paragraphs.

251. Ormsby and Gilmore were consumers.

252. Imhoff was a supplier of legal services.

253. Over the telephone, Imhoff represented directly to Ormsby, and indirectly to Gilmore, that Imhoff was the former Johnny Cochran Law Firm and that Ormsby probably remembered the "catchy phrase."

254. Imhoff was not the former Johnny Cochran Law Firm, but instead a group of attorneys that had left the Johnny Cochran Law Firm to start their own firm.

255. Imhoff made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that it was not the former Johnny Cochran Law Firm.

256. As the proximate cause of Imhoff's deceptive misrepresentations, Ormsby lost $54,250.00 by paying Imhoff to supply attorneys that had no affiliation with the Johnny Cochran Law Firm.

257. Ormsby's and Gilmore's reliance on Imhoff's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

258. Gilmore's reliance on Imhoff's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

**COUNT XXI**
**VIOLATION OF KANSAS**
**CONSUMER PROTECTION ACT**
**(Imhoff & Lengyel-Leahu)**

259. Plaintiff incorporates by reference all preceding paragraphs.

260. Ormsby and Gilmore were consumers.

261. Imhoff was a supplier of legal services.

262. Lengyel-Leahu was a supplier or legal services.

263. Lengyel-Leahu was acting in the scope of his employment with Imhoff when he spoke to directly to Ormsby, and indirectly to Gilmore.

264. Lengyel-Leahu represented directly to Ormsby, and indirectly to Gilmore, that Imhoff and Lengyel-Leahu's legal services would result in Gilmore's release "in a year."

265. Lengyel-Leahu's legal services did not and could not result in Gilmore's release in one year.

266. Lengyel-Leahu made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that neither his nor Imhoff's legal services could result in Gilmore's release in one year.

267. Ormsby lost $54,250.00 as the proximate cause of Lengyel-Leahu's deceptive misrepresentations that he could obtain Gilmore's release in one year.

268. Ormsby's and Gilmore's reliance on Lengyel-Leahu's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

269. Gilmore's reliance on Lengyel-Leahu's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

### COUNT XXII
### VIOLATION OF KANSAS
### CONSUMER PROTECTION ACT
### (Imhoff & Lengyel-Leahu)

270. Plaintiff incorporates by reference all preceding paragraphs.

271. Ormsby and Gilmore were consumers.

272. Imhoff was a supplier of legal services.

273. Lengyel-Leahu was a supplier or legal services.

274. Lengyel-Leahu was acting in the scope of his employment with Imhoff when he spoke to directly to Ormsby, and indirectly to Gilmore.

275. Lengyel-Leahu represented directly to Ormsby, and indirectly to Gilmore, that Imhoff and Lengyel-Leahu's legal services would "show the judge" that Gilmore could not legally have been convicted of the crime Gilmore was convicted of.

276. Lengyel-Leahu and Imhoff's legal services did not and could not "show the judge" that Gilmore could not legally have been convicted of the crime Gilmore was convicted of.

277. Lengyel-Leahu made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that neither his nor Imhoff's legal services could "show the judge" that Gilmore could not legally have been convicted of the crime Gilmore was convicted of.

278. Ormsby lost $54,250.00 as the proximate cause of Imhoff and Lengyel-Leahu's deceptive misrepresentations that he and Imhoff could "show the judge" that

Gilmore could not legally have been convicted of the crime Gilmore was convicted of.

279. Ormsby's and Gilmore's reliance on Imhoff and Lengyel-Leahu's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

280. Gilmore's reliance on Imhoff and Lengyel-Leahu's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

## COUNT XXIII
## VIOLATION OF KANSAS
## CONSUMER PROTECTION ACT
### (Imhoff & Lengyel-Leahu)

281. Plaintiff incorporates by reference all preceding paragraphs.

282. Ormsby and Gilmore were consumers.

283. Imhoff was a supplier of legal services.

284. Lengyel-Leahu was a supplier or legal services.

285. Lengyel-Leahu was acting in the scope of his employment with Imhoff when he spoke to directly to Ormsby, and indirectly to Gilmore.

286. Lengyel-Leahu represented directly to Ormsby, and indirectly to Gilmore, that Imhoff and Lengyel-Leahu's legal services were greater than the "po-dunk" attorneys in Kansas.

287. Lengyel-Leahu and Imhoff's legal services were not greater than the "po-dunk" attorneys in Kansas.

288. Lengyel-Leahu made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that neither his nor Imhoff's legal services were any greater than the "po-dunk" attorneys in Kansas.

289. Ormsby lost $54,250.00 as the proximate cause of Imhoff and Lengyel-Leahu's deceptive misrepresentations that he and Imhoff had legal services superior to those of the "po-dunk" attorneys in Kansas.

290. Ormsby's and Gilmore's reliance on Imhoff and Lengyel-Leahu's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

291. Gilmore's reliance on Imhoff and Lengyel-Leahu's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

**COUNT XXIV**
**VIOLATION OF KANSAS**
**CONSUMER PROTECTION ACT**
**(Imhoff & Lengyel-Leahu)**

292. Plaintiff incorporates by reference all preceding paragraphs.

293. Ormsby and Gilmore were consumers.

294. Imhoff was a supplier of legal services.

295. Lengyel-Leahu was a supplier or legal services.

296. Lengyel-Leahu was acting in the scope of his employment with Imhoff when he spoke to directly to Ormsby, and indirectly to Gilmore.

297. Lengyel-Leahu represented directly to Ormsby, and indirectly to Gilmore, that Imhoff and Lengyel-Leahu's legal services would "show the judge" that Gilmore's conviction did not require a life sentence.

298. Lengyel-Leahu and Imhoff's legal services would not and could not "show the judge" that Gilmore's conviction did not require a life sentence.

299. Lengyel-Leahu made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that neither his nor Imhoff's legal services could "show the judge" that Gilmore's conviction did not require a life sentence.

300. Ormsby lost $54,250.00 as the proximate cause of Imhoff and Lengyel-Leahu's deceptive misrepresentations that he and Imhoff had legal services that could "show the judge" that Gilmore's conviction did not require a life sentence.

301. Ormsby's and Gilmore's reliance on Imhoff and Lengyel-Leahu's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

302. Gilmore's reliance on Imhoff and Lengyel-Leahu's deceptive misrepresentations caused him to suffer additional emotional stress from

facing a life sentence in a higher-security prison than he otherwise would have been.

## COUNT XXV
## VIOLATION OF KANSAS
## CONSUMER PROTECTION ACT
### (Imhoff & Lengyel-Leahu)

303.   Plaintiff incorporates by reference all preceding paragraphs.

304.   Ormsby and Gilmore were consumers.

305.   Imhoff was a supplier of legal services.

306.   Lengyel-Leahu was a supplier or legal services.

307.   Lengyel-Leahu was acting in the scope of his employment with Imhoff when he spoke to directly to Ormsby, and indirectly to Gilmore.

308.   Lengyel-Leahu represented directly to Ormsby, and indirectly to Gilmore, that Imhoff and Lengyel-Leahu's legal services had convinced many judges in California to "throw out" similar cases.

309.   Lengyel-Leahu and Imhoff's legal services had not convinced any judges in California to "throw out" any cases similar to Gilmore's.

310.   Lengyel-Leahu made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that neither his nor Imhoff's legal services had convinced many judges in California to "throw out" cases similar to Gilmore's.

311. Ormsby lost $54,250.00 as the proximate cause of Imhoff and Lengyel-Leahu's deceptive misrepresentations that he and Imhoff had legal services that could convince the judge to "throw out" Gilmore's case.

312. Ormsby's and Gilmore's reliance on Imhoff and Lengyel-Leahu's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

313. Gilmore's reliance on Imhoff and Lengyel-Leahu's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

**COUNT XXVI**
**VIOLATION OF KANSAS**
**CONSUMER PROTECTION ACT**
**(Imhoff & Lengyel-Leahu)**

314. Plaintiff incorporates by reference all preceding paragraphs.

315. Ormsby and Gilmore were consumers.

316. Imhoff was a supplier of legal services.

317. Lengyel-Leahu was a supplier or legal services.

318. Lengyel-Leahu was acting in the scope of his employment with Imhoff when he spoke to directly to Ormsby, and indirectly to Gilmore.

319. Lengyel-Leahu represented directly to Ormsby, and indirectly to Gilmore, that Imhoff and Lengyel-Leahu's legal services would result in Gilmore's

conviction being "thrown out" because the judge had not instructed the jury on measurements, quantities, or amounts.

320. Lengyel-Leahu and Imhoff's legal services did not and could not result in Gilmore's conviction being "thrown out" because the judge had not instructed the jury on measurements, quantities, or amounts.

321. Lengyel-Leahu made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that neither his nor Imhoff's legal services could result in Gilmore's conviction being "thrown out" because the judge had not instructed the jury on measurements, quantities, or amounts.

322. Ormsby lost $54,250.00 as the proximate cause of Imhoff and Lengyel-Leahu's deceptive misrepresentations that he and Imhoff had legal services that would result in Gilmore's conviction being "thrown out" because the judge had not instructed the jury on measurements, quantities, or amounts.

323. Ormsby's and Gilmore's reliance on Imhoff and Lengyel-Leahu's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

324. Gilmore's reliance on Imhoff and Lengyel-Leahu's deceptive misrepresentations caused him to suffer additional emotional stress from facing a life sentence in a higher-security prison than he otherwise would have been.

## COUNT XXVII
## VIOLATION OF KANSAS CONSUMER PROTECTION ACT
### (Imhoff & Lengyel-Leahu)

325. Plaintiff incorporates by reference all preceding paragraphs.

326. Ormsby and Gilmore were consumers.

327. Imhoff was a supplier of legal services.

328. Lengyel-Leahu was a supplier or legal services.

329. Lengyel-Leahu was acting in the scope of his employment with Imhoff when he spoke to directly to Ormsby, and indirectly to Gilmore.

330. Lengyel-Leahu represented directly to Ormsby, and indirectly to Gilmore, that Imhoff only used "the best attorneys."

331. Imhoff did not only use "the best attorneys."

332. Lengyel-Leahu made such representations directly to Ormsby, and indirectly to Gilmore, knowing or with reason to know that Imhoff's did not only use "the best attorneys."

333. Ormsby lost $54,250.00 as the proximate cause of Imhoff and Lengyel-Leahu's deceptive misrepresentations that Imhoff only used "the best attorneys."

334. Ormsby's and Gilmore's reliance on Imhoff and Lengyel-Leahu's deceptive misrepresentations caused suffering and emotional damage due to the increased anxiety and emotional trauma of believing Gilmore would die in prison.

335. Gilmore's reliance on Imhoff and Lengyel-Leahu's deceptive misrepresentations caused him to suffer additional emotional stress from

facing a life sentence in a higher-security prison than he otherwise would have been.

## ECONOMIC DAMAGES

336.  Plaintiff incorporates by reference all preceding paragraphs.

337.  As a result of Imhoff and Lengyel-Leahu's acts, as described above, Ormsby was deprived of the amount she paid Imhoff: $54,250.

## PAIN & SUFFERING

338.  Plaintiff incorporates by reference all preceding paragraphs.

339.  As a result of Imhoff, Lengyel-Leahu, and Williams's conduct, as alleged in Counts 1 through 27, Gilmore is entitled to $100,000 for increased anxiety.

340.  As a result of Imhoff, Lengyel-Leahu, and Williams's conduct, as alleged in Counts 1 through 27, Ormsby is entitled to $100,000 for increased anxiety.

341.  As a result of Imhoff, Lengyel-Leahu, and Williams's conduct, as alleged in Counts 1 through 27, Gilmore is entitled to $100,000 for loss of personal freedom associated with being housed in a higher-security facility.

## PUNITIVE DAMAGES

342.  Plaintiff incorporates by reference all preceding paragraphs.

343.  As alleged in Counts 7 through 11, Imhoff acted willfully, wantonly, or fraudulently toward Ormsby and Gilmore.

344.  As alleged in Counts 7 through 11, Lengyel-Leahu acted willfully, wantonly, or fraudulently toward Ormsby and Gilmore.

345. Imhoff authorized, either expressly or impliedly, Lengyel-Leahu to act in the manner alleged in Counts 7 through 11.

346. Imhoff expressly or impliedly ratified Lengyel-Leahu's conduct, as alleged in Counts 7 through 11.

347. Imhoff's conduct warrants punitive damages of $1,000,000.

348. Lengyel-Leahu's conduct warrants punitive damages of $1,000,000.

## STATUTORY DAMAGES

349. Plaintiff incorporates by reference all preceding paragraphs.

350. As alleged in Counts 12 through 27, Imhoff violated the Kansas Consumer Protection Act.

351. As alleged in Counts 12 through 27, Lengyel-Leahu violated the Kansas Consumer Protection Act.

352. Under Kan. Stat. Ann. § 50-636(a), each and every violation of the Act entitles Ormsby and Gilmore to $10,000 in statutory damages.

353. Ormsby and Gilmore are entitled to $160,000 in statutory damages.

## ATTORNEY'S FEES

354. Plaintiff incorporates by reference all preceding paragraphs.

355. As alleged in Counts 12 through 27, Imhoff violated the Kansas Consumer Protection Act.

356. As alleged in Counts 12 through 27, Lengyel-Leahu violated the Kansas Consumer Protection Act.

357.   Under Kan. Stat. Ann. § 50-634(e), each and every violation of the Act entitles

Ormsby and Gilmore to an award of attorney's fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants and for relief

as follows:

1.      economic damages of $54,250;

2.      compensatory damages of $200,000;

3.      punitive damages of $2,000,000;

4.      statutory damages of $160,000;

5.      attorney's fees;

6.      costs and judgment interest; and,

7.      such further relief as the Court may find just and equitable.


Respectfully Submitted,

**BROWN & RUPRECHT, PC**


__/s/ Branden A. Bell_____
Branden A. Bell, KS# 22618
911 Main Street
Suite 2300
Kansas City, Missouri 64105
P: 816-292-7000
F: 816-292-7050
e bbell@brlawkc.com
ATTORNEY FOR PLAINTIFF